## London and Corbin v. State.

4247                                                   161 S. W. 2d 207

Opinion delivered April 27, 1942.

Claude F. Cooper, Ivy & Nailling and T. J. Crowder, for appellant.

Jack Holt, Attorney General, and Jno. P. Streepey, Assistant Attorney General, for appellee.

Mehaffy, J.   The prosecuting attorney filed his information charging the defendants with burglary and grand larceny. It charged that they did, in the nighttime, on April 17, 1941, with force break and enter the store building of E. G. Robbins in the town of Joiner, Arkansas, with the intent then and there of committing grand larceny by stealing and carrying away personal property of the value of more than $10, and that they did steal and carry away one adding machine of the value of $225 and $300 in lawful money of the United States.

The appellants were arraigned and entered pleas of not guilty.  Appellants were found guilty of the crime

of burglary and their punishment fixed at imprisonment in the state penitentiary for a period of three years. They were not found guilty of grand larceny.

There was a motion for new trial which was overruled, the defendants saved their exceptions, prayed an appeal to the Supreme Court which was granted and the case is here on appeal.

William Guthrie, a witness for the state, testified that his home is in St. Louis; that he has been in the penitentiary both in Missouri and Arkansas; was sent to the penitentiary in Missouri on a charge of robbery and released August 12, 1940, and went to Sikeston, Missouri; worked four months for Paul Jones, who runs a night club in Sikeston, and then worked a short time as a taxi driver for Jack London; London owns two taxicabs, drove one of them himself; on April 17, 1941, he was cooking for Joe Ryan; that was the first time he had met Ben Adams and Arthur McRee; Russell Corbin brought them to Ryan's cafe; Corbin lived in Caruthersville; they went to find a man who could open a safe; witness told them Jack London could, so they went to get in touch with him; they said they knew a safe down in Arkansas where they could get from $500 to $1,000; when witness got off from work he went home and changed clothes; the others picked him up there and they all went to Joiner; got in London's taxi in front of the house and talked; their car had Oklahoma license behind; London asked about the safe; witness had never had any dealing with safe breaking before; somebody said London would get the tools; the deal was made in London's taxi; the five of them went to Hayti; two in London's taxi and the rest in the Ford; left London's taxi in Hayti and all got in the other car and went to Joiner; got there about midnight and parked the car behind the store; could not get into the store and went down to a junk pile and got a piece of iron and opened the door with it; London got the tools out of the car and opened the safe; the fellow that got the death penalty and Russell Corbin stood guard on the outside; witness held a flashlight; McRee was around in the store; Jack opened the safe with a punch and hammer; witness did

not know how much he got, all he saw was about $30; McRee took the cash register out with him; he tried to open it and could not; they took about four cartons of cigarettes; after they left the store, they stopped on a bridge and someone threw the cash register out; later stopped to change a tire; witness does not know where it was; he was asleep; McRee and Adams went after the tire and Jack and Corbin were in the back seat; waked up just before they got to Hayti; divided the money and witness got $7; when they got to Hayti, London and witness got in the taxi and went to Sikeston; the other three got in their car and said they were going to Caruthersville. On cross-examination this witness said that he had quite a criminal career; served two terms in the penitentiary before this one; both terms for robbery; did not rob anyone at Sikeston; has gone as long as several months without robbing or stealing; never knew Ben Adams or Arthur McRee until they came that day with Russell Corbin; had never been in Joiner before, but has passed through; after they had broken into the store and got the cash register and money they went through Truman, but did not stop until they had a flat tire; does not remember where they had the flat, he was asleep; got to Hayti about three o'clock in the morning; got to Sikeston about 4:15 and stopped at the cafe; went to the penitentiary in Arkansas in connection with another job; have been there about three and a half months; witness is cook at the cafe and doing his best to make a parole; his brother is a salesman, his father a real estate salesman in St. Louis, and witness is the black sheep. When they went to Joiner witness was armed with a gun, a .44, and there was another gun, a .38, but does not know who carried it.

Arthur McRee, another witness for the state, testified that he is 29 years old, single; present address in Arkansas State Penitentiary; serving a life sentence on a charge of robbery and murder. His testimony as to the burglary and larceny is practically the same as that of Guthrie; witness said that he had known Guthrie since 1939; had been in jail together. Witness then testified about their having crooked dice to sell; tried to

sell to Corbin, but he would not buy; witness testified that he had killed a man in Arkansas and he got a life term in the penitentiary; Ben Adams got the death penalty for the murder; they were arrested on the Joiner job about the first of June at Dallas, Texas; Guthrie was in jail at Blytheville; Ben actually killed the man; he owned a liquor store and when they went in to rob him he resisted and they killed him.

Donald Watson testified that he lives at Arbyrd, Missouri, and runs a filling station owned by E. J. Eubanks; has worked there about two years; 34 years old and married; in April, 1941, he fixed a flat; drove out after midnight and fixed it; it was either a Chevrolet or Ford; thinks it was a Ford; witness recognized Ben Adams and Arthur McRee as the men who came to the filling station; Adams came first and stayed at the filling station while witness went up and got the tire and brought it back; McRee came back with him; witness had trouble jacking up the car; it was muddy and the car was heavy; did not notice how many people were in the car; thinks McRee got out of the front seat; heard voices in the car and when they moved around in the car it would shake; does not know how many people were in the car; McRee and Adams are the men who came after the tire, and they are the only ones witness saw; just heard talking in the car and knew that there must have been more than one in the car.

Ike Lane testified that he lived between Joiner and Tyronza; was present when Alfred Jones found the cash register; the water was about two feet deep in the river; the register was open.

Riley Staton testified that he was present when Jones found the cash register in Tyronza River about fifteen feet north of the bridge.

Ben Adams testified that he was confined in the death cell at the state penitentiary for murder. His testimony was substantially the same as that of Guthrie.

E. T. Robbins testified about his store being entered and the cash register being stolen and said there was about $30 in it; was positive that $235 was stolen from the safe.

There was other evidence about the finding of the cash register and that cash register in court is the one taken from Robbins' store.

The appellants then made a motion for a directed verdict, which was overruled. They introduced Harry Walden who testified in substance that he lived in Sikeston; had lived there 20 years; that he drove one of Jack London's taxis for about a year, and was driving for him in April, 1941; that he knows positively that Jack London was in Sikeston, Missouri, on the night of April 17, 1941, and worked with him all night.

Glenn Grigsby testified that he worked for the government and employed Jack London to drive him in his cab when it was necessary; saw London on April 17, 1941; London took him to a tavern in West Sikeston, stayed there about fifteen minutes, and then drove him to the Top Hat; drove him until about 10:15, witness fixed the date and what took place from a diary he keeps.

Clyde Smith testified that he has lived in Caruthersville since 1934, and works for the Brown Shoe Company; on the night of April 17, 1941, he was in Caruthersville and attended a picture show at the Rodgers Theatre; saw Russell Corbin at the theatre and talked to him; left the show before Corbin did, about 11 o'clock.

Ralph Willburn testified that he has lived in Sikeston about a year and a half; that on the night of April 17, 1941, he saw Jack London about nine o'clock at the Lane Theatre; London came in his cab and took witness to work.

Floyd Hinchey testified that he lives at Point Pleasant, Missouri, about 20 miles from Caruthersville; witness is Russell Corbin's cousin; that they went to a show together about nine o'clock on the night of April 17, 1941, and left about 11 o'clock.

Mrs. Orie Corbin testified that she lives at Caruthersville and runs a grocery store; Russell Corbin is her nephew and was staying with her in April, 1941; he came in between 11 and 12 o'clock on the night of April 17, 1941; was there in the morning; Floyd Hinchey was with him and stayed all night there.

Other witnesses testified to the same effect; that is, about seeing the appellants at different places at the time of the burglary. There was then some rebuttal testimony introduced about the reputation of witnesses, but it is unnecessary to copy it here.

Appellants contend that the evidence is not sufficient to support the verdict; that the state relied upon the testimony of three accomplices and offered no testimony connecting the appellants with the burglary. In this contention, we agree with appellants. The three witnesses testifying against the appellants were all criminals; they had all been guilty of murder and robbery, and one of them, at the time, was under sentence of death for murder.

Section 4017 of Pope's Digest is as follows: "A conviction cannot be had in any case of felony upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof. Provided, in misdemeanor cases a conviction may be had upon the testimony of an accomplice."

The only evidence claimed to corroborate the testimony of the accomplice in this case was that of Donald Watson. He testified that he ran a filling station owned by E. J. Eubanks; that he fixed a flat tire in April, 1941, on either a Chevrolet or Ford; he recognized Ben Adams and Arthur McRee as the men who came to the filling station; went up and got the tire and brought it back; McRee came back with him; it was almost daylight; car was about a mile and a quarter from the station; after he fixed the tire they rode back with him to the car. When asked if witness knew how many people were in the car he answered that he did not; that he only heard voices in the car and that people moved about, shaking the car; the only men he saw were the two he identified.

This was all the evidence offered in corroboration of the evidence of the accomplices, and there is nothing in this evidence that tends in any way to connect the

appellants with the commission of the offense. He says there were some persons in the car, but he does not know who they were. How can it be said that this testimony tends to connect the appellants with the commission of the offense? .

In the case of *Bennett and Holiman* v. *State,* 201 Ark. 237, 144 S. W. 2d 476, 131 A. L. R. 908, this court quoted with approval from the case of *Casteel* v. *State,* 151 Ark. 69, 235 S. W. 386, as follows: "The court instructed the jury that the witness, Termis Butts, was an accomplice, and that the appellant could not be convicted upon his testimony unless the same was corroborated by other testimony tending to connect appellant with the commission of the crime charged against him, and that the corroboration was not sufficient if it merely showed that the offense was committed and the circumstances thereof, and that unless the jury were convinced beyond a reasonable doubt that the testimony of Butts was so corroborated they should find the appellant not guilty. In the above instruction the court correctly declared the law applicable to the testimony of an accomplice." To support this holding the following cases are cited: § 3181, C. & M. Digest; *Earnest* v. *State,* 120 Ark. 148, 179 S. W. 174; *Brewer* v. *State,* 137 Ark. 243, 208 S. W. 290.

This court has many times passed on the statute above quoted and has always held that the corroboration was not sufficient unless it tended to connect the defendant with the offense.

In the case of *Vaughan* v. *State,* 58 Ark. 353, 24 S. W. 885, this court said: "The corroboration must be something more than 'to merely show that the offense was committed, and the circumstances thereof.' He must be corroborated by other evidence *tending to connect the defendant with the offense.* Facts that go to the identity of the defendant in connection with the crime—that tend to connect him with it—would be *material,* and if the accomplice is corroborated as to these, it is sufficient."

Speaking of the corroboration necessary for a conviction, this court said in the case of *Wilson* v. *State,* 190 Ark. 651, 80 S. W. 2d 925: "The court is of opinion

that the testimony of the Lees, A. J. Kent and Buck Martin, at the most, created only a suspicion against appellant and did not, independently, and without the aid of the testimony of the accomplices, tend to connect appellant with the commission of the crime.''

Many decisions of this court might be cited in support of the rule that requires corroborating evidence tending to show the connection of the defendant with the offense, but it would serve no useful purpose to collect all of them.

In the case of *Griffin* v. *State,* 172 Ark. 606, 289 S. W. 765, this court said, after quoting the above rule: ''It is immaterial whether the court and jury believe the accomplice or not.'' So, in this case, it is immaterial whether the court and jury believe the accomplices or not.

Under the statute quoted the testimony of the accomplices must be corroborated by other evidence tending to connect the defendants with the crime, and in this case there is no such corroboration.

It is unnecessary to discuss the other question raised by appellants.

The judgment of the circuit court is reversed, and the cause remanded for a new trial.